Antony BROWN, et al., Plaintiffs,

v.

PRO FOOTBALL, INC., d/b/a
Washington Redskins, et
al., Defendants.

Civ. A. No. 90–1071 (RCL).

United States District Court,
District of Columbia.

June 4, 1991.

## MEMORANDUM OPINION

(Striking Nonstatutory Labor
Exemption Defense)

LAMBERTH, District Judge.

This case comes before the court on plaintiffs' motion to strike defendants' nonstatutory labor exemption defense or for partial summary judgment ("Plaintiffs' Motion to Strike"), defendants' motion for summary judgment as to the nonstatutory labor exemption ("Defendants' Motion for Summary Judgment"), and the parties' respective oppositions and replies. After consideration of all the filings, arguments, and authorities presented by both parties in their filings and at oral argument, the court will grant Plaintiffs' Motion to Strike and will deny Defendants' Motion for Summary Judgment.

## I. FACTS

Plaintiffs in this action are professional football players who played on developmental squads of the twenty-eight National Football League teams during the 1989 regular and post-seasons. By court order, plaintiffs have been certified as a class for purposes of the present case.[1] Defendants are each of the twenty-eight teams which comprise the National Football League and the National Football League ("NFL"), itself.

On February 23, 1989, the NFL's Long Range Planning/Finance Committee discussed the framework for establishing developmental squads of up to six players for each of the NFL teams. Plaintiffs' Statement of Material Facts Not in Genuine Dispute and Supporting Exhibits ("Plaintiffs' Exhibits") at 4. The developmental squad was a new concept which, under the terms of 1989 Resolution G–2 ("Resolution G–2"), would permit each NFL team to sign rookie and first year free agents to services contracts for the 1989 NFL season. *See* 1989 Resolution G–2 at Plaintiffs' Exhibits at 5. At its annual meeting on March 22, 1989, the NFL, *inter alia,* voted to adopt Resolution G–2 and to amend the NFL Constitution and Bylaws accordingly. Under the terms of Resolution G–2 the NFL teams would be able to sign developmental squad players beginning September 5, 1989. *Id.*

The present case and the motions currently before the court involve the compensation terms of Resolution G–2, which provided that developmental squad players would be paid a fixed salary instead of being permitted to negotiate their own salaries. While Resolution G–2 established that developmental squad players would receive one fixed weekly salary, the amount to be paid was left blank. On April 7, 1989, Jack M. Donlan, Executive Director of the NFL Management Council sent a letter and a copy of Resolution G–2 to Eugene Upshaw, representative of the NFL Players Association ("NFLPA"). The letter informed Upshaw of the NFL's adoption of Resolution G–2 and suggested an April meeting "to negotiate the terms and conditions applicable to developmental squad players." Plaintiffs' Exhibits at 6. On April 29, 1989, James A. Conway, Assistant Executive Director and General Counsel of the NFL Management Council wrote a letter to Richard E. Berthelson, of the NFLPA, summarizing a telephone conversation between the two in which they briefly discussed developmental squads and requesting a face-to-face meeting in early May to discuss salary and benefit terms for developmental squad players. *Id.* at 7.

On May 17, 1989, the Executive Committee of the NFL Management Council agreed to pay developmental squad players a fixed salary of $1,000 per week. *Id.* at 8,

---

**1.** Named plaintiffs include Antony Brown, James Bishop, John Buddenberg, Gary Couch, Graig Davis, Matthew J. Jaworski, Ricky Andrews, and Wesley Pritchert.

¶ 14. On May 18, 1989, Donlan sent Upshaw a letter again indicating the NFL Management Council's desire to meet to negotiate the terms and conditions applicable to developmental squad players and specifically proposing, *inter alia*, the following modification to the 1982 Collective Bargaining Agreement:

Article XXII, *Salaries*, shall not apply, In lieu thereof, establish special services contract providing for salaries of $1,000 per week, prorated on a daily basis.

*Id.* at 9. On May 30, 1989, Upshaw faxed a letter to Donlan indicating the NFLPA's position that developmental squad players must have the right to negotiate their own salaries. *Id.* at 10. The fax also suggested a discussion of Resolution G–2 when the parties were to meet the following week. *Id.* On June 16, 1989, Donlan sent a letter to various members of one of the NFL committees summarizing the results of a meeting between the NFL and the NFLPA. *Id.* at 12. The letter indicated that the NFLPA would not agree to the plan to pay developmental squad players a fixed salary and insisted that those players be given the right to negotiate their own salaries. *Id.* In the letter, Donlan concluded that "[f]or implementation purposes, the [developmental squad] issue is clearly at an impasse." *Id.*

On June 30, 1989, Donlan sent Upshaw a letter suggesting a meeting during the second week in July. *Id.* at 15. Attached to the letter was a draft developmental squad contract. *Id.* On June 30, 1989, Donlan also wrote a file memorandum indicating that it was his understanding that the NFLPA would never accept a contract for the developmental squad players in which they were not permitted to negotiate their own salaries. *Id.* at 16. On July 6, 1989, Upshaw sent Donlan a letter which stated the NFLPA's position that "all players, including developmental, should have the right to negotiate salary terms, and that no fixed wage for any group of players is acceptable to the NFLPA." *Id.* at 18. In this letter, Upshaw also indicated that the NFLPA rejected the conditions suggested for developmental squad players which the NFL presented to the NFLPA and which

included a fixed salary of $1,000 per week. *Id.*

On August 14, 1989, Conway sent a final version of the draft Developmental Player Contract to Upshaw with a letter attached indicating that the NFL was "available for negotiations on this and other issues anytime." *Id.* at 22. On September 5, 1989, the day NFL teams began signing developmental squad players, NFL Commissioner Pete Rozelle circulated a memorandum to all NFL teams reminding them that "weekly compensation to be paid to Developmental Squad Players is $1,000. Individually negotiated terms above or below $1,000 are not permitted." *Id.* at 28. The memorandum indicated that any other form of compensation or benefit, such as per diem and housing arrangements, was impermissible. *Id.* On October 17, 1989, Upshaw sent a letter to Donlan in response to one received from Donlan. In this letter, Upshaw stated the NFLPA view that the developmental squad salary cap "violates the law." *Id.* at 31. Plaintiffs, through the NFLPA, filed the present suit on May 9, 1990.

## II. LEGAL STANDARDS

Plaintiffs have moved to strike defendants' nonstatutory labor exemption defense. Under Rule 12(f) of the Federal Rules of Civil Procedure, the court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Plaintiffs have moved, in the alternative, for partial summary judgment on the nonstatutory labor exemption defense. Because the court has considered matters outside the pleadings, the court will consider plaintiffs' motion under Rule 56(c), which indicates that summary judgment is appropriate when examination of the record as a whole reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In examining the record, the court must view all inferences in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In order to

determine whether to grant plaintiffs' motion for partial summary judgment, the court must address the nonstatutory labor exemption and its place within the collective bargaining process in the context of the present case.

## III. ANALYSIS

### A. *Background.*

The purpose of collective bargaining is to enable employers and unions to resolve disputes among themselves without having to resort to the courts. One court has noted that the:

> labor arena is one with well established rules which are intended to foster negotiated settlements rather than intervention by the courts. The League and the Players have accepted this "level playing field" as the basis for their often tempestuous relationship, and we believe that there is substantial justification for requiring the parties to continue to fight on it, so that bargaining and the exertion of economic force may be used to bring about legitimate compromise.

*Powell v. National Football League,* 930 F.2d 1293, 1303 (8th Cir.1989), *cert. denied* —— U.S. ——, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991).

■ The NFLPA is a labor organization under the terms of 29 U.S.C. § 152(5) and has exclusive bargaining rights for all NFL players. *See* 29 U.S.C. § 159(a) (1973). This exclusive bargaining right extends to developmental squad players insofar as they are potential NFL players: "[n]ot only present but potential future players for a professional sports league are parties to the bargaining relationship." *Zimmerman v. National Football League,* 632 F.Supp. 398, 405 (D.D.C.1986), citing *Wood v. National Basketball Association,* 602 F.Supp. 525 (S.D.N.Y.1984). Potential NFL players, such as the developmental squad players in the present case, are part of the collective bargaining relationship between the NFL and the NFLPA for purposes of the nonstatutory labor exemption. *Zimmerman v. National Football League,* 632 F.Supp. at 405.[2]

■ In 1977, the NFL and the NFLPA entered into a collective bargaining agreement. After the 1977 Collective Bargaining Agreement expired, the parties adopted the 1982 collective bargaining agreement, which itself expired in August 1987. Currently there is no collective bargaining agreement in effect. After a collective bargaining agreement expires, both the union and the employer have a continuing obligation to bargain. National Labor Relations Act, 29 U.S.C. § 158(a)(5) & (d) (1982); *see NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Employers are obligated to maintain the status quo as to wages and working conditions created by a previous collective bargaining agreement before the parties reach "impasse" in negotiations. *Powell v. National Football League,* 930 F.2d at 1299–1301 (citations omitted).

■ During the life of a collective bargaining agreement, the nonstatutory labor exemption shields both employers and labor unions from antitrust liability for restraints which involve mandatory subjects of collective bargaining[3] found in the collec-

---

**2.** The status of plaintiffs in this case is not affected by a decision issued by a United States District Court in Minnesota which held that the NFLPA was no longer involved in a collective bargaining relationship with the NFL. *Powell v. NFL,* 764 F.Supp. 1351 (D.Minn.1991). The negotiations between the NFL and NFLPA in the present case and the NFL's implementation of the developmental squad concept preceded the actions in *Powell* upon which the District Court in Minnesota based its present holding. The Minnesota District Court's holding suggested that the NFLPA's status as the players' collective bargaining representative ended on December 5, 1989—after all communications between the NFL and NFLPA on the developmental squad issue had ended and after the NFL implemented the developmental squad concept. Both parties agreed that the issue of the NFLPA's renunciation of its bargaining rights is not material to this case because all conduct material to this case occurred prior to the NFLPA's renunciation. Plaintiffs' Statement Of Material Facts Not In Genuine Dispute at ¶ 4; Defendants' Response to Plaintiffs' Statement Of Material Facts Not In Genuine Dispute at ¶ 4.

**3.** Under the NLRA, mandatory subjects of collective bargaining include "wage, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d) (1973); *NLRB v. Borg-War-*

tive bargaining agreement. If not included in a collective bargaining agreement such restraints would subject the employer to liability under the antitrust laws. *Powell v. National Football League,* 930 F.2d at 1296; *Mackey v. National Football League,* 543 F.2d 606, 612 (8th Cir.1976); *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 n. 14 (3rd Cir.1974) ("to preserve the integrity of the negotiating process, employers who bargain in good faith must be entitled to claim the antitrust exemption"). The "availability of the non-statutory exemption for a particular agreement turns upon whether the relevant federal labor policy is deserving of pre-eminence over federal antitrust policy under the circumstances of the particular case." *Mackey v. National Football League,* 543 F.2d at 613.

■ The nonstatutory labor exemption is a narrow exception to antitrust liability. The purpose of that exemption is to effect an "accommodation between the congressional policy favoring collective bargaining under the National Labor Relations Act and the congressional policy favoring free competition in business markets...." *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975). This accommodation "requires that some *union-employer agreements* be accorded a limited nonstatutory exemption from antitrust liability." *Id.* (emphasis added).

While the nonstatutory labor exemption normally applies to protect employers from antitrust liability where a collective bargaining agreement exists, some courts have extended that exemption beyond expiration of a collective bargaining agreement. The Court of Appeals for the District of Columbia Circuit has stated that "provisions of [an] expired collective-bargaining agreement that relate to mandatory sub-

jects [of collective bargaining] are said to survive the agreement's expiration." *Southwestern Steel & Supply, Inc. v. NLRB,* 806 F.2d 1111, 1113 (D.C.Cir.1986). Wages being one of the mandatory subjects of collective bargaining, an "expired collective bargaining agreement continues to define the status quo as to wages and working conditions and the employer is required to maintain the status quo until the parties negotiate to a new agreement or bargain in good faith to impasse." *NLRB v. Cauthorne,* 691 F.2d 1023, 1025 (D.C.Cir. 1982) (citations and internal punctuation marks omitted). The Supreme Court has stated that the purpose of extending the terms of a collective bargaining agreement beyond expiration is to promote industrial peace "by fostering a non-coercive environment that is conducive to serious negotiations on a new contract." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 544 n. 5, 108 S.Ct. 830, 833 n. 5, 98 L.Ed.2d 936 (1988), *quoting NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).

In citing a case from this circuit, the Supreme Court has noted that "after bargaining to an impasse ... an employer does not violate the [National Labor Relations] Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." *Id.,* 484 U.S. at 544 n. 5, 108 S.Ct. at 833 n. 5, citing *American Federation of Television & Radio Artists v. NLRB,* 395 F.2d 622, 624 (D.C.Cir.1968). In *Laborers Health & Welfare Trust Fund,* the Supreme Court did not say that such unilateral changes, whether before or after impasse, would not violate the antitrust laws.[4]

B. *Nonstatutory Labor Exemption Ends At Expiration.*

■ The present dispute raises one principal issue for the court to resolve: wheth-

---

*ner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

**4.** It is important to note that the *American Federation* case cited by the Supreme Court involved a labor dispute in which there was a collective bargaining agreement in effect and that the employer sought to change mandatory

subjects already encompassed in that *existing* agreement. The present case involves an expired collective bargaining agreement where the employer seeks the shelter of the nonstatutory exemption for new terms involving mandatory subjects that were never part of the expired agreement.

er the nonstatutory labor exemption shields the NFL from antitrust liability for its having implemented the uniform salary provisions in the developmental squad player contracts during the 1989 NFL season. This court holds that the NFL's implementation of the salary provisions of Resolution G–2 is not shielded by the nonstatutory labor exemption because that exemption expired when the 1982 Collective Bargaining Agreement expired in 1987.

While this court recognizes the precedent which establishes that the nonstatutory labor exemption survives expiration of a collective bargaining agreement, this court questions the wisdom of continued application of that court-made doctrine beyond expiration due to the fact that such an exemption hinders rather than facilitates the execution of new collective bargaining agreements. The present case provides a good example. The NFL and NFLPA signed a collective bargaining agreement in 1982. That agreement expired in 1987. It is now 1991 and the parties have not negotiated a new collective bargaining agreement. The court has no indication as to when the parties will execute a new agreement. For the past four years, by continuing to hold parties to the terms of the expired collective bargaining agreement, courts have been treating the parties as if they had a current agreement. Such treatment results not from any legislation or express assent of the parties, but from a judicial fiction ostensibly fashioned to promote the negotiation of a new collective bargaining agreement with terms mutually acceptable to both parties.

Unfortunately, the nonstatutory labor exemption actually provides a disincentive for the NFL to sign a new collective bargaining agreement. If the NFL is satisfied with the terms in the expired agreement, all it need do is maintain the status quo and continue to receive exemption from antitrust liability for restraints to which the union no longer agrees. As mentioned earlier, the stated purpose of extending the terms of an expired collective bargaining agreement was to foster a "non-coercive environment that is conducive to serious negotiations on a new contract. *Laborers*

*Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. at 544 n. 5, 108 S.Ct. at 833 n. 5, *quoting NLRB v. Katz*, 369 U.S. at 743, 82 S.Ct. at 1111. Rather than creating an atmosphere conducive to serious negotiations, extension of the terms of an expired collective bargaining agreement and the nonstatutory labor exemption beyond expiration of the agreement actually discourages serious negotiations on a new collective bargaining agreement. As long as the employer is satisfied with the status quo, that employer has no incentive to negotiate a new agreement. Moreover, such an extension apparently removes the firm deadline necessary for fruitful negotiation. The certainty that treble damages under the antitrust laws would attach after a date certain would create the atmosphere of economic certainty and urgency necessary for the parties to negotiate seriously and sign a new collective bargaining agreement.

In *Powell v. National Football League*, 930 F.2d at 1298–99, a panel of the Eighth Circuit noted an NFL concern that expiration of the nonstatutory labor exemption at impasse would motivate the NFLPA to reach impasse so it could sue for treble damages under the antitrust laws. The NFL's concern supports this court's position that the nonstatutory exemption, and, necessarily, the terms of the collective bargaining agreement, should end at expiration of that agreement. Such an endpoint is rational given that the continued recognition of the terms and application of the exemption after expiration permits the NFL to commit antitrust violations where there is no actual union consent to exempt those otherwise unlawful restraints from application of the antitrust laws. Because union consent is a prerequisite for the exemption to apply, this court cannot find that the exemption can apply where union consent is absent.

The unions have every right to seek treble damages for unlawful NFL antitrust restraints. It is this court's view that the NFL's antitrust liability should attach at expiration of the collective bargaining agreement, not at some indeterminate point

beyond expiration which is labelled "impasse." Antitrust exemption should end at expiration because the reason for the exemption no longer exists: the union no longer agrees to the restraint and therefore continuation of the restraint violates the Sherman Act. Moreover, extension beyond expiration of the collective bargaining agreement breeds uncertainty for the parties and the courts and also inhibits negotiation on a new collective bargaining agreement. If the terms and the nonstatutory exemption don't end at expiration, parties don't have deadlines after which they can be certain that antitrust liability properly applies. Without such certainty, no new agreement will be executed.

Without an endpoint at expiration, the terms of a collective bargaining agreement and the applicability of the nonstatutory labor exemption remain in perpetual limbo. Even if a court were to set expiration at impasse, this would not foster execution of a new collective bargaining agreement[5] or remove any uncertainty because courts would still have to determine the existence of "impasse" and whether court intervention at that point would be appropriate—determinations as to which different courts will likely differ.[6]

Ending the nonstatutory exemption at expiration honors the overall policy goal of the labor laws which is to foster negotiated agreements between labor and employers. This policy is not being furthered by the law as it stands today. One court, jurisdictionally bound by *Powell v. National Football League*, 930 F.2d 1293, which extended the nonstatutory labor exemption beyond impasse, recently held the nonstatutory exemption inapplicable to NFL action because the NFLPA had given up its role as the collective bargaining agent for NFL players. *Powell v. National Football League*, 764 F.Supp. 1351 (D.Minn.1991). This court is not bound by the Eighth Circuit's holding in *Powell* and will not follow it. This court does not believe that this nation's labor policy, as discussed in this opinion, requires a union to give up its rights as the bargaining agent for employees in order to escape application of the terms of an expired collective bargaining agreement and reinstate the NFL's liability under the antitrust laws. Certainly such a measure does not promote the negotiation of collective bargaining agreements or labor peace. *See Powell v. National Football League*, 930 F.2d at 1310 (Lay, Chief J., dissenting from denial of rehearing *en banc*) ("the union should not be compelled, short of

---

**5.** Ethan Lock, who has written in depth on the issue before the court, has noted that:

> simultaneous expiration of the agreement and the labor exemption undoubtedly would have had an impact on the parties' relative leverage in collective bargaining. At a minimum, such a result would have forced the parties to engage in meaningful negotiations at an earlier time and, in the absence of agreement, precipitated a *quicker resolution of the merits of the* pending lawsuit[s].

Lock, *The Scope of the Labor Exemption in Professional Sports*, 1989 Duke L.J. 339, 400 [hereafter referred to as "Lock, *The Scope of the Labor Exemption* "].

**6.** As will be discussed more fully below, the Supreme Court has described impasse as a recurring feature of collective bargaining which is often broken when either party brings various economic forces to bear in order to break the impasse. As such, when presented with an impasse claim, the NLRB or the courts would not only have to determine whether impasse occurred, but whether, if so, court or NLRB intervention at this point is premature given the parties respective economic forces which can

help the parties break the impasse and resolve their own differences. Lock has noted that "Congress designed the procedural framework of the NLRA to ensure that employers and employee representatives will make an honest effort to resolve their differences at the bargaining table. Congress clearly intended the parties involved in a collective bargaining relationship to resolve their own disputes." Lock, *The Scope of the Labor Exemption* 1989 Duke L.J. at 382 (citations omitted).

One court has added a new level of uncertainty to application of the nonstatutory exemption beyond expiration by holding that an employer can impose a restraint after expiration only if the employer "reasonably believes that the [restraint] or a close variant of it will be incorporated in the next collective bargaining agreement." *Bridgeman v. NBA*, 675 F.Supp. 960, 967 (D.N.J.1987). Not only does this disregard the fact that the union has not agreed to the restraint, it requires courts to make the determination of whether the employer believed the restraint would be incorporated in a subsequent agreement, and whether such belief was "reasonable." Again, different courts, given the same facts, will reach different conclusions.

self-destruction, to accept illegal restraints it deems undesirable"); *id.* at 1305–06 (Heaney, J., dissenting) ("end result of majority opinion is that once a union agrees to a package of player restraints, it will be bound forever unless the union forfeits its bargaining rights").

Extending the nonstatutory labor exemption beyond expiration also deprives labor of an important bargaining right and impinges on labor's freedom of contract. The threat of treble damages under the antitrust laws is one of union's economic weapons in its collective bargaining arsenal. Exempting employers from application of the antitrust laws in the absence of a collective bargaining agreement deprives unions of a statutorily created bargaining chip in the negotiating process. This chip may well be labor's strongest weapon insofar as labor has the power to subject employers to great economic risk under the antitrust and labor laws for activities which Congress has determined are unlawful restraints. This economic force is a lawful chip the union has to induce employers to reach agreement on collective bargaining terms so that the exemption would apply.

At the same time, extension of the nonstatutory labor exemption beyond expiration of the collective bargaining agreement is inconsistent with the primary policy behind the labor laws and the nonstatutory labor exemption. As discussed earlier, that goal is to promote the execution of new collective bargaining agreements. Under the nonstatutory labor exemption, employers are exempt from certain applications of the antitrust law. Such exemption is consistent with the policies behind labor laws and the exemption which together seek to encourage employers and unions to agree on terms relating to conditions of employment. Terms included within a collective bargaining agreement are protected. Extension of the exemption beyond expiration of that agreement frustrates the relevant policies because it treats the parties as if there is a collective bargaining agreement when in fact there is none. If the parties have not expressly agreed to terms relating to conditions of employment, this court can find no discernible justification for granting the employer any exemption from the antitrust laws. To do so would reward employers simply for being part of a collective bargaining relationship where employers and labor had at one time agreed on terms relating to conditions of employment.

This court agrees with Lock's conclusion that an "employer should be exposed to antitrust liability for continuing to enforce a provision that violates the Sherman Act if the union has ceased to consent to that provision. Such a provision is immunized *only* by the union's consent." Lock, *The Scope of the Labor Exemption,* 1989 Duke L.J. at 376. By failing to expressly continue the terms of an expired collective bargaining agreement, the union has ceased to consent to the terms therein. Neither does the NLRA nor should the courts "dictate the substantive terms of any bargain between the parties." *Id.* at 382 (citations omitted). On this subject, Lock has stated that an:

> employer should not be permitted to use the status quo doctrine to shield otherwise illegal provisions that the union no longer desires. The fact that the restraint was previously subject to good faith negotiations is relevant to an employer's obligation to maintain the status quo; previous good-faith negotiations are not relevant to the application or nonapplication of the labor exemption once the agreement has expired. Upon expiration of the agreement, an employer either should be forced to comply with the antitrust laws or willing to negotiate away benefits in return for the unreasonable restraint. The [NFL] owners' argument that such a result creates an unjustifiable shift in bargaining leverage is difficult to accept. The union *should* have leverage to modify or eliminate an illegal restraint it determines is no longer in its best interest.

*Id.* at 391. If the union does not have the power to eliminate a once agreed to restraint, "an agreement to a particular *unreasonable* restraint for a finite period operates to waive, indefinitely or permanently, a party's rights under the antitrust laws. In short, the players' rights under

the antitrust laws lie, after the agreement has expired, in the hands of the owners." *Id.* at 393. This court does not believe that a union, by signing a collective bargaining agreement, can be required to be governed by its terms, absent express approval, after that agreement has expired.

Extension of the nonstatutory exemption beyond expiration of the collective bargaining agreement also deprives unions of their right to bind themselves through a contract, for a limited duration only, to restraints that would otherwise be unlawful under the Sherman Act. Courts infringe on this right when they fashion an exemption for those restraints which shield employers indefinitely beyond expiration of the collective bargaining agreement. Through extension of the nonstatutory labor exemption beyond expiration, courts impose indefinite restraints on unions which the unions only agreed to for periods of time indicated in the collective bargaining agreement. In his article, Lock noted that the right to contract is

> one of the most fundamental rights established under the NLRA [and that it enables] the parties ... to establish through good faith negotiations the terms of their own agreement. This right necessarily incorporates the freedom of contract. In fact, freedom of contract is so fundamental that the parties may agree in certain instances on unreasonable restraints of trade. The freedom to contract also enables the parties to determine the length of their agreement.

*Id.* at 394 (citations omitted). Through the nonstatutory labor exemption, courts actually deprive labor of their right to contract as to an integral contract term: duration.

Ending the nonstatutory labor exemption and the terms of a collective bargaining agreement at expiration of the agreement provides a bright line for the parties to take into the bargaining room and for the NLRB and courts to rule from when presented with exemption disputes. Such a bright line would extricate courts from the

morass the current state of the law has produced and is consistent with the policies embodied in the labor and antitrust laws as well as the judicially created nonstatutory labor exemption.[7]

### C. *Nonstatutory Labor Exemption Does Not Extend Beyond Impasse.*

■ Alternatively, the NFL's action is not shielded from antitrust liability in the present case because, even assuming that the nonstatutory labor exemption extends beyond expiration of the collective bargaining agreement and that the parties bargained in good faith to impasse, this court holds that the nonstatutory labor exemption does not extend antitrust liability protection beyond impasse after a collective bargaining agreement has expired.

■ Under the three part test established by the Eighth Circuit in *Mackey v. NFL*, 543 F.2d 606, the nonstatutory labor exemption is implicated in the present case. In *Mackey*, the Eighth Circuit established a three part test to determine whether the nonstatutory labor exemption should apply:

> First, labor policy favoring collective bargaining may potentially be given preeminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship.... Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining.... Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining.

*Id.* at 614 (citations omitted).

The present case satisfies all three prongs. First, the developmental squad salary restraint primarily affected only the parties to the collective bargaining relationship: the NFL employers and prospective NFL employees. Second, the salary terms

---

7. This court believes that the decision to extend any labor exemption beyond expiration of col-

lective bargaining agreements is an issue properly left to Congress to resolve.

at issue in this lawsuit are mandatory subjects of collective bargaining. 29 U.S.C. § 158(d); *NLRB v. Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Third, assuming, for purposes of this part of the court's opinion, that the salary provisions in the present dispute were encompassed in the expired collective bargaining agreement, the parties did bargain at arm's length and in good faith to impasse. The parties met face-to-face on one occasion, had several telephone conversations, and exchanged correspondence delineating their respective positions on numerous occasions between March 22, 1989, when the NFL adopted Resolution G–2, and September 5, 1989, the effective date of developmental squad formation. The positions of both the NFL and NFLPA were clear: the NFL wanted a fixed salary for all developmental squad players; the NFLPA would not accept any terms which did not afford developmental squad players the right to negotiate their own salaries.

■ The fact that neither the NFL nor the NFLPA changed their respective positions regarding the developmental squad salary terms during the five month period does not suggest the absence of good faith bargaining. During collective bargaining, no party is required to agree to a proposal or to make a concession. *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 106, 90 S.Ct. 821, 825, 25 L.Ed.2d 146 (1970).

The fact that neither party relented from its original bargaining position supports the conclusion that the NFL and NFLPA had negotiated to "impasse." The Supreme Court has accepted the following definition of impasse: "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless...." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. at 543 n. 5, 108 S.Ct. at 833 n. 5 (citations omitted). The Supreme Court has also noted that impasse is "only a temporary deadlock or hiatus in negotiations" and "a recurring feature in the bargaining process ... which in almost all cases is eventually broken, through either a change of mind or the application of economic force." *Charles D. Bonanno Linen Service v. NLRB*, 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982) (citations and quotation marks omitted). The "economic force" which parties can apply includes strikes, lockouts, pickets, and the hiring of replacement workers. *See e.g.* 29 U.S.C. § 104 (listing some permissible union activities during labor disputes which cannot be subjected to restraining order or injunctions).

At impasse, the NFL implemented the developmental squad concept, including the fixed salary provisions. Because this court finds that the nonstatutory labor exemption to the antitrust laws does not extend beyond impasse, the NFL may be held liable for imposing the developmental squad salary restraint. This court understands the policy behind extending antitrust protection for restraints contained in a collective bargaining agreement beyond expiration. In theory, the purpose of such extension is to facilitate negotiation of a new collective bargaining agreement: "[f]reezing the status quo ante after a collective bargaining agreement has expired promotes industrial peace by fostering a noncoercive atmosphere that is conducive to serious negotiations on a new contract." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. at 544, 108 S.Ct. at 833. *See NLRB v. Cauthorne*, 691 F.2d at 1025 (expired collective bargaining agreement defines, and employer must maintain, status quo as to wages and working conditions until parties negotiate new agreement).

To extend nonstatutory labor exemption protection to unilateral changes in the terms of an expired collective bargaining agreement after impasse does not facilitate negotiation of a new collective bargaining agreement. Such extension actually hinders such negotiation by forcing unions to accept terms concerning mandatory subjects of collective bargaining to which they never agreed simply because one party

claimed impasse.[8]

Extending the nonstatutory labor exemption beyond expiration of the collective bargaining agreement burdens the negotiating process by forcing the parties to appeal to the NLRB or courts for resolution of such issues as whether the parties bargained in good faith after expiration and whether the parties in fact reached impasse. The adjudicating body must also determine whether this impasse may be broken by the parties' use of economic force, thereby making intervention premature. Given that the Supreme Court has characterized impasse as a recurring feature in negotiations, the suitability of extending the antitrust exemption to or beyond impasse becomes problematic. Such extension certainly encourages employers to feign or force impasse so as to justify unilateral imposition of restraints which may once have been but are no longer acceptable to the union. In addition, given that the definition of impasse acknowledges that it is a "recurring feature in the bargaining process" which is eventually broken in "almost all cases" by the application of economic force, *Bonanno Linen Service v. NLRB*, 454 U.S. at 412, 102 S.Ct. at 725, permitting implementation of pre-impasse proposals which are then protected from antitrust liability by the nonstatutory labor exemption appears premature because it enables employers to obtain their objectives without having to make any compromises or resort to the economic forces which are part of the collective bargaining process.

Assuming only for purposes of this part of the court's opinion that the non-statutory labor exemption extends beyond expiration of a collective bargaining agreement,

this court holds that the nonstatutory labor exemption ends at impasse because the fact that the parties have reached impasse shows that they no longer agree on terms involving mandatory subjects of collective bargaining. At impasse, at the latest, the policies behind providing the nonstatutory labor exemption are no longer furthered by continued application of that exemption. If the purpose of providing the nonstatutory labor exemption is to promote reaching new collective bargaining agreements by shielding restraints imposed within the context of collective bargaining agreements, it is inconsistent with that purpose to extend that exemption to restraints to which the union no longer agrees, even if the union had at one time agreed to the restraint and it was in a collective bargaining agreement. It seems that the only justification for such an extension would be that the restraint resulted from the fact that there was a collective bargaining *relationship* and that the parties had negotiated to some extent. Such an extension would actually discourage collective bargaining agreements because it would encourage employers to reach impasse since they could then implement restraints which the union found unacceptable without having to make any bargaining concessions. Employers would then be immune from antitrust liability for those restraints. This court does not believe that such an extension was contemplated in the national labor policy.

Allowing unilateral imposition of restraints at impasse would also short circuit the collective bargaining process as established by statute. As a means of overcoming impasse, unions and employers have various economic forces at their disposal.

**8.** While such extension can be justified by virtue of the fact that the union assented to the restraint at one point (when it executed the collective bargaining agreement), this assent, one might argue, can justifiably be regarded as continuing so long as there is no post-expiration objection to the restraint. This court believes that a better rule of law requires the parties to expressly agree to extend the terms in the collective bargaining agreement after expiration in order for the nonstatutory labor exemption to continue to shield the restraints from antitrust liability. Such a rule would obviate the fiction of assumed continued assent until impasse and would remove the issue of the applicability of the nonstatutory labor exemption from the indefinite twilight zone it is now in. Courts should not hold unions and employers to indefinite fictional contracts by treating the parties as if a collective bargaining agreement exists when in fact none exists. Furthermore, there is little incentive for the parties to execute a new collective bargaining agreement when the parties know that courts will continue indefinitely to honor the terms of an expired collective bargaining agreement without the parties even having to expressly agree to extend application of the terms in that agreement.

For example, various statutes exempt certain union activities, such as strikes, pickets, and boycotts, from the antitrust laws. *Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. at 621–22, 95 S.Ct. at 1834–35. The NFL has its own economic forces, such as lockouts and hiring replacement players if the players strike. *See Charles D. Bonanno Linen Service Inc. v. NLRB,* 454 U.S. at 415–16 n. 9, 102 S.Ct. at 727 n. 9 (discussing economic forces of employers). In addition, both the NFL and NFLPA have the right to withhold consent or concessions on other bargaining provisions in order to force compromise or capitulation on a given issue during bargaining. In the context of this case, immunity from the antitrust laws for implementation at impasse of provisions which were not part of the expired collective bargaining agreement frustrates the normal operation of the collective bargaining process and gives employers an unfair advantage over unions by enabling employers to implement, without risk of antitrust liability, restraints to which the union has never agreed or no longer agrees. If permitted to implement pre-impasse proposals without risk of antitrust liability in order to obtain their objectives without having to make any concessions which would lead to the execution of a collective bargaining agreement, employers would have no incentive to negotiate collective bargaining agreements. Similarly, such extension would discourage unions from entering collective bargaining agreements because they would not want to be held indeterminately to restraints which they may only be willing to accept for a set amount of time as set forth in the agreement. Moreover, extending the exemption beyond impasse deprives labor of one of its rightful bargaining forces: the threat of antitrust sanctions. For these reasons, this court will not extend the antitrust shield of the nonstatutory labor exemption beyond impasse.[9]

### D. *Nonstatutory Labor Exemption Does Not Apply.*

As an additional alternative holding, this court finds that the nonstatutory labor exemption does not shield the NFL from antitrust liability for the salary provisions implemented here because those salary provisions were never encompassed in the expired collective bargaining agreement. Because the developmental squad was novel, and because the NFL implemented new salary provisions which were not part of the expired collective bargaining agreement, the nonstatutory labor exemption does not shield the NFL's implementation of the new developmental squad salary provisions from antitrust liability. The case law cited above establishes that the nonstatutory labor exemption protects employers from antitrust liability for restraints contained in a collective bargaining agreement. This court does not read the nonstatutory labor exemption to extend antitrust protection to restraints that are not part of an existing, much less expired, collective bargaining agreement.

Courts cannot compel a party to accept contract terms to which that party has never agreed. In the labor field, the Supreme Court has found that, while the NLRB has the power to require employers and unions to negotiate, it does *not* have the power to compel either to agree to any substantive contractual provision of a collective bargaining agreement. *H.K. Porter Co. v. NLRB,* 397 U.S. at 103–104 & 109, 90 S.Ct. at 823–24 & 826. The provision of the NLRA which relates to the obligation to bargain collectively expressly states that

---

**9.** This court's finding that the nonstatutory labor exemption does not extend beyond impasse is consistent with Supreme Court precedent. The Supreme Court and this Circuit have acknowledged that employers do not violate the labor laws by unilaterally changing employment terms after impasse as long as these changes have been offered as good faith proposals in bargaining. *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. at 543–44 n. 5, 108 S.Ct. at 833 n. 5; *Charles D. Bonanno Linen Service v. NLRB,* 454 U.S. at 415–16 n. 9, 102 S.Ct. at 727 n. 9; *Southwestern Steel & Supply, Inc. v. NLRB,* 806 F.2d at 1113; *NLRB v. Cauthorne,* 691 F.2d at 1025 (same); *but see Powell v. NFL,* 930 F.2d at 1303–04 (nonstatutory labor exemption extends beyond impasse). However, those rulings do not stand for the proposition that such unilateral changes or restraints are exempt from the antitrust laws.

this obligation "does not compel either party to agree to a proposal or require the making of a concession...." *Id.* at 106, 90 S.Ct. at 825, citing 29 U.S.C. § 158(d) (1973 & Supp.1991). Given that the Supreme Court has acknowledged that the law does not permit the NLRB to force a party to agree to a substantive contract provision, this court finds no rationale which would justify this court's imposing the developmental squad salary terms on the NFLPA because the NFLPA never agreed to that provision in the 1982 Collective Bargaining Agreement. Indeed, at the time that agreement was executed, the developmental squad concept had never been raised by either party.

 While they do relate to wages, a mandatory subject of collective bargaining, the developmental squad salary provisions were never part of a collective bargaining agreement to which the NFLPA agreed. *See* Defendants' Motion for Summary Judgment, Statement of Material Facts Not in Genuine Dispute at ¶ 7 (defendants admit that "1982 bargaining agreement contained no provisions with respect to developmental squads...."). The law regarding the nonstatutory labor exemption applies that exemption only to changes in terms relating to mandatory subjects of collective bargaining in a collective bargaining agreement. *See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. at 544 n. 6, 108 S.Ct. at 833 n. 6 ("any unilateral change by the employer in the pension fund *arrangements provided by an expired agreement* is an unfair labor practice") (emphasis added); *Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676, 689, 85 S.Ct. 1596, 1601–02, 14 L.Ed.2d 640 (1965) ("[e]mployers and unions are required to bargain about wages, hours, and working conditions, and this fact weighs heavily in favor of anti-

trust exemption for *agreements* on these subjects") (emphasis added); *Southwestern Steel & Supply, Inc. v. NLRB,* 806 F.2d at 1113 ("provisions of [an] expired collective-bargaining *agreement* that relate to mandatory subjects are said to survive the agreement's expiration") (emphasis added); *NLRB v. Cauthorne,* 691 F.2d at 1025 (addressing employer's preimpasse "unilateral change in *established* wages or working conditions") (emphasis added); *Mackey v. National Football League,* 543 F.2d at 612–13 (nonstatutory labor exemption applied to "Rozelle Rule" because it was encompassed by *prior collective bargaining agreements*) (emphasis added); *see* Lock, *The Scope of the Labor Exemption,* 1989 Duke L.J. at 352 n. 85 ("union approval seems to be a prerequisite to the application of the exemption").

The present case does not involve any change in preexisting wage terms of either an active or expired collective bargaining agreement. In fact, creation of the developmental squads added a novel category of players to each NFL club. These players were not treated under the salary terms applicable to regular NFL players. Under the 1982 Collective Bargaining Agreement, the NFL players were expressly given the right to negotiate the salary terms of their contracts. 1982 Collective Bargaining Agreement at Article XXII, Plaintiffs' Exhibits at 1. By contrast, the developmental squad contracts indicates that the prospective developmental squad players had no right to negotiate their own salary terms but instead were to receive a fixed non-negotiable salary of $1,000 per week. Plaintiffs' Exhibits at 8, 9, 15 & 28. Moreover, the salary provision applicable to regular NFL players, as established in the expired collective bargaining agreement, were not effected in any manner by implementation of the developmental squad salary provisions.[10]

---

10. The fact that the principal issue in this case involves salary provisions, a mandatory subject of collective bargaining, does not trigger protection of the nonstatutory labor exemption simply by virtue of the fact that the expired collective bargaining agreement had salary provisions. That common thread is not enough. As discussed above, the developmental squad salary provision involved a wholly new concept involving the creation of a new category of football player which was never negotiated by the NFL and NFLPA and had never been included in the expired collective bargaining agreement. The NFL acknowledged as much when it proposed a

Because the developmental squad salary provisions were a new concept and not a change in terms of the expired collective bargaining agreement, the policy behind continuing the nonstatutory labor exemption for the terms of a collective bargaining agreement after expiration (to foster an atmosphere conducive to the negotiation of a new collective bargaining agreement) does not apply. To hold that the nonstatutory labor exemption extends to shield the NFL from antitrust liability for imposing restraints never before agreed to by the union would not only infringe on the union's freedom to contract, *H.K. Porter Co. v. NLRB*, 397 U.S. at 108, 90 S.Ct. at 826 (one of fundamental policies of NLRA is freedom of contract),[11] but would also contradict the very purpose of the antitrust exemption by not promoting execution of a collective bargaining agreement with terms mutually acceptable to employer and labor union alike. Labor unions would be unlikely to sign collective bargaining agreements with employers if they believed that they would be forced to accept terms to which they never agreed.

Finding that the salary restraint at issue in this case was never included in a collective bargaining agreement, this court holds that the nonstatutory labor exemption does not shield the NFL's action from antitrust liability. *See Mackey v. NFL*, 543 F.2d 606, 615–16 (8th Cir.1976) (restraint at issue does not qualify for exemption from antitrust laws because restraint had never been bargained for with NFLPA and because NFL unilaterally incorporated restraint into collective bargaining agreements).

## IV. CONCLUSION

For the reasons stated in this opinion, defendants' motion for summary judgment will be denied. Partial summary judge-

ment will be granted for plaintiffs as to defendants' nonstatutory labor exemption defense. Defendants will not be permitted to raise the nonstatutory labor exemption as a defense to plaintiffs' antitrust claims in this case.

---

modification of the expired 1982 Collective Bargaining Agreement, not to change the salary provision but to make it inapplicable to developmental squad players who would be covered by a "special services contract" of $1,000 per week. Plaintiffs' Exhibits at 9.

**11.** The Supreme Court also noted that allowing an adjudicator to "compel agreement when the

parties themselves are unable to agree would violate the fundamental premise on which the [NLRA] is based—private bargaining under governmental supervision of procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co. v. NLRB,* 397 U.S. at 108, 90 S.Ct. at 826.