Junior BRIDGEMAN, David Robinson, Armon Gilliam, Reggie Williams, Jose Ortiz, Rory Sparrow, Darrell Walker, Phil Hubbard, and Ken Barlow, Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, Atlanta Hawks, Ltd., Boston Celtics Limited Partnership, Capital Bullets Basketball Club, Inc., Chicago Professional Sports Limited Partnership, Dallas Basketball Limited, Denver Nuggets Entertainment Co., L.P., Detroit Pistons Basketball Co., Golden State Warriors, A California Limited Partnership, Houston Rockets Pro Basketball Club Ltd., Jazz Basketball Investors, Jerry H. Buss, d/b/a California Sports and the Los Angeles Lakers, Kings Professional Basketball Club, Inc., LAC Basketball Club, Inc., Meadowlands Basketball Associates, t/a New Jersey Nets, Milwaukee Bucks, Inc., National Advertising Service Inc., Cleveland Cavaliers Division, New York Knickerbockers Basketball, a division of Madison Square Garden Center, Inc., Pacers Basketball Corp., The Philadelphia 76ers Basketball Club, Inc., Phoenix Professional Basketball Club, Ltd., Pro Basketball, Inc., Seattle Supersonics Inc., Spurs Professional Basketball Club, Ltd., Defendants.

NATIONAL BASKETBALL ASSOCIATION, Atlanta Hawks, Ltd., Boston Celtics Limited Partnership, Capital Bullets Basketball Club, Inc., Chicago Professional Sports Limited Partnership, Dallas Basketball Limited, Denver Nuggets Entertainment Co., L.P., Detroit Pistons Basketball Co., Golden State Warriors, A California Limited Partnership, Houston Rockets Pro Basketball Club Ltd., Jazz Basketball Investors, Jerry H. Buss, d/b/a California Sports and the Los Angeles Lakers, Kings Professional Basketball Club, Inc., LAC Basketball Club, Inc., Meadowlands Basketball Associates, t/a New Jersey Nets, Milwaukee Bucks, Inc., National Advertising Service Inc., Cleveland Cavaliers Division, New York Knickerbockers Basketball, a division of Madison Square Garden Center, Inc., Pacers Basketball Corp., The Philadelphia 76ers Basketball Club, Inc., Phoenix Professional Basketball Club, Ltd., Pro Basketball, Inc., Seattle Supersonics Inc., Spurs Professional Basketball Club, Ltd., Counterclaimants,

v.

Junior BRIDGEMAN, David Robinson, Armon Gilliam, Reggie Williams, Jose Ortiz, Rory Sparrow, Darrell Walker, Phil Hubbard, and Ken Barlow, Counterdefendants.

Civ. A. No. 87–4189.

United States District Court, D. New Jersey.

Dec. 29, 1987.

lectively referred to as "the NBA") of the college player draft, the salary cap, and the right of first refusal constitutes an antitrust violation.

## I. PROCEDURAL HISTORY

Before instituting this action, plaintiffs and the National Basketball Players Association ("the Players Association") filed a class action complaint with this court on October 1, 1987 ("Bridgeman I"), alleging on behalf of themselves and all class members the same antitrust violations against the same defendants that are included in the instant complaint. 87 Civ. 4001. Because the plaintiffs in Bridgeman I sought speedy resolution of the labor exemption issue and the NBA defendants had raised objections to the class action allegations contained in that complaint, I suggested that a second complaint be filed eliminating the class allegations so as to put the case in a procedural posture that would permit an early resolution of the labor exemption issue. Plaintiffs filed the complaint in the present action ("Bridgeman II") on October 16, 1987.

The matter is now before the court on the players' motion for partial summary judgment and a declaratory judgment declaring any labor exemption to the antitrust laws inapplicable to the practices at issue in this case. The NBA has cross-moved for an order directing plaintiffs to join the National Basketball Players Association ("the Players Association") as a party, and for summary judgment dismissing the complaint.[1]

Hannoch Weisman, P.C. by Albert Besser, Roseland, N.J., Proskauer, Rose, Goetz & Mendelsohn by Jeffrey A. Mishkin, Michael Cardozo, Gary B. Bettman, New York City, for defendants.

Lowenstein, Sandler, Kohl, Fisher & Boylan by Gerald Krovatin, Roseland, N.J., Weil, Gotshal & Manges by James W. Quinn, Jeffrey Kessler, New York City, for plaintiffs.

DEBEVOISE, District Judge:

Plaintiffs, a group of current and former players and first round draft choices in the NBA ("the players"), brought this action pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. sections 15 and 26, and the Sherman Antitrust Act, 15 U.S.C. section 1 et seq. Their complaint alleges that the enforcement by the National Basketball Association and its 23 member teams (col-

## II. FACTS

The following facts are undisputed. As noted above, the practices at issue are the college player draft, the salary cap, and the right of first refusal. Under the college player draft, the NBA defendants allocate the exclusive rights to negotiate with and sign rookie players. The salary cap is a system whereby the NBA defendants agree to set maximum limits on the aggre-

---

1. None of the motions before the court addresses the underlying merits of plaintiffs' antitrust claims. The substantive issue being decided to-

day involves only the threshold question whether the practices at issue are insulated by a labor exemption.

gate amount teams can spend to compensate their players. Under the right of first refusal, an NBA team has the right to retain a veteran free agent's services indefinitely by matching offers received by that player from other NBA teams. As described below, the players agreed to these practices for a limited period of time in a settlement agreement that arose out of an antitrust class action lawsuit.

*The Robertson Litigation and Settlement Agreement*

In 1970, the NBA players commenced a class action suit against the NBA in the federal district court for the Southern District of New York, challenging on antitrust grounds certain player restrictions imposed by the NBA team owners, including the NBA college player draft and the reserve system. The NBA defendants moved for summary judgment, arguing, among other things, that the practices were shielded from the anti-trust laws by a labor exemption. The district court denied the NBA's motion. *Robertson v. National Basketball Association*, 389 F.Supp. 867, 884–89 (S.D. N.Y.1975).

In 1976, the parties in the *Robertson* litigation entered and the district court approved a settlement agreement.[2] This agreement effected a number of changes in the operation of the NBA, including modification of the college player draft and institution of the right of first refusal. The settlement agreement provided that it would expire at the end of the 1986–1987 NBA season, and further provided that

> Neither the settlement of the Class Action, nor entry into this Stipulation and Settlement Agreement or any collective bargaining agreement or any Player Contract, nor the effectuation thereof, nor any practice or course of dealing thereunder shall be deemed to be a waiver or estoppel by any NBA player or players or the Players Association of their right to challenge in a court of competent jurisdiction any future unilat-

eral imposition by the NBA or any NBA member of any rule, regulation, policy, practice or agreement, or to contend (subject to the right of the NBA to contend otherwise) that the same is not a mandatory subject of collective bargaining or a subject over which they are otherwise required to collectively bargain, nor do they concede that the same is a mandatory subject of collective bargaining or a subject over which they are otherwise required to collectively bargain.

*Collective Bargaining in the NBA*

When the *Robertson* settlement agreement was adopted in 1976, the Players Association and the NBA also entered into a multi-year collective bargaining agreement that incorporated the substantive terms of the settlement agreement. The 1976 collective bargaining agreement expired on June 1, 1979, and on October 10, 1980, the parties again entered into a multi-year collective bargaining agreement that expressly incorporated the terms of the *Robertson* settlement agreement.

The 1980 agreement expired on June 1, 1982. In 1983, the NBA defendants sought for the first time to introduce the salary cap, contending that such a restriction was necessary because the majority of NBA teams were losing money, in part because of rising player salaries and benefits. The players responded by filing a lawsuit challenging the legality of the proposed practice. *Lanier v. National Basketball Association*, 82 Civ. 4935 (S.D.N.Y.). A Special Master appointed to hear disputes under the *Robertson* settlement agreement determined that the salary cap would violate the terms of the settlement agreement, and therefore could not be imposed absent a modification of that agreement.

The Players Association and the NBA entered into a Memorandum of Understanding that modified the expired 1980 collective bargaining agreement to include,

---

**2.** Apart from its argument that the practices in question are immune from antitrust scrutiny because they were included in the most recent collective bargaining agreement, the NBA does

not contend that any aspect of the *Robertson* litigation or settlement agreement precludes plaintiffs' claims.

among other things, a salary cap, and continued the agreement in force through the end of the 1986–87 season. On June 13, 1983, the district court approved a modification of the *Robertson* settlement agreement to incorporate the terms of the Memorandum of Understanding.

*Negotiations for a New Collective Bargaining Agreement*

Since February 11, 1987, the parties have held meetings seeking to reach agreement on a new collective bargaining agreement. There has been considerable disagreement on the three player restrictions at issue in this case, with the players demanding elimination of at least the college player draft and the right of first refusal.

On June 8, 1987, the NBA and the Players Association executed a "moratorium agreement," agreeing to postpone any lawsuit and player signings, while continuing to engage in good faith negotiations in an effort to reach a new collective bargaining agreement. No agreement, however, has been reached, and the moratorium period expired on October 1, 1987.

The players have informed the NBA that they no longer consent to any player restraints. By letter dated October 14, 1987, the Players Association stated that it would not engage in any further collective bargaining negotiations until this lawsuit had been resolved. On November 3, 1987, the NBA filed an unfair labor practice charge with the National Labor Relations Board seeking a directive that the Players Association return to the bargaining table. The NBA has continued to operate under the terms of the most recent collective bargaining agreement, including the practices at issue in this case.

## III. DISCUSSION

### *The NBA's Motion for Joinder*

Fed.R.Civ.P. 19(a) provides that

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction ... shall be joined as a party in the action if ... [the person] claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

In support of its motion to require joinder of the Players Association, the NBA contends that the Players Association has an interest in the outcome of this litigation, and that disposition of the case in its absence could lead to inconsistent decisions by different courts on the identical issue. However, the risk of inconsistent determinations on the issues in this suit will remain whether or not the Players Association is joined. A judgment against the union in this case would have preclusive effect only against the union; players not named as plaintiffs would not be barred from bringing the same claims in separate suits whether or not the union had been joined as a plaintiff. *See O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 167 (2d Cir.1984). Preclusive effect against all of the NBA players will be possible only in the Bridgeman I action if the plaintiff class is certified and that action moves forward.

Moreover, a judgment in this case may have preclusive effect against the union whether or not it is joined here as a party, since attorneys for the players do not dispute that the union has an interest in, and has sponsored and financed this litigation from the beginning. *See, e.g. Gill and Duffus Services, Inc. v. A.M. Nural Islam*, 675 F.2d 404, 406 (D.C.Cir.1982) (per curiam). Thus, although there is a possibility of inconsistent determinations on the issues in this case, that risk would not be alleviated by joinder of the Players Association. The NBA's motion to require joinder is denied.

### *The Cross–Motions for Summary Judgment*

The concept of a labor exemption finds its source in sections 6 and 20 of the Clay-

ton Act, 15 U.S.C. section 17 and 29 U.S.C. section 52, and the Norris–LaGuardia Act, 29 U.S.C. sections 104, 105 and 113. Those provisions declare that labor unions are not combinations or conspiracies in restraint of trade, and specifically exempt certain union activities such as secondary picketing and group boycotts from the coverage of the antitrust laws. *See Connell Co. v. Plumbers and Steamfitters*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). This statutory exemption insulates inherently anticompetitive collective activities by employees because they are favored by federal labor policy. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).

The statutory exemption extends to legitimate labor activities unilaterally undertaken by a union in furtherance of its own interests. *See United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). It does not extend to concerted action or agreements between unions and non-labor groups. This is where the nonstatutory exemption comes into play. The Supreme Court has held that in order to properly accommodate the congressional policy favoring free competition in business markets with the congressional policy favoring collective bargaining under the National Labor Relations Act, 29 U.S.C. section 151 *et seq.* ("NLRA"), certain union-employer agreements must be accorded a limited nonstatutory exemption from antitrust sanctions. *See Connell Co., supra.*

In a 1976 case involving player restraints in the National Football League,[3] the Eighth Circuit summarized the scope of the nonstatutory labor exemption:

First, the labor policy favoring collective bargaining may potentially be given preeminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining. Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bone fide arm's-length bargaining.

*Mackey v. National Football League*, 543 F.2d 606, 614 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed. 2d 59 (1977) (citations omitted).

The practices challenged by plaintiffs—the player draft, the right of first refusal, and the salary cap—were included in the most recent collective bargaining agreement between the players and the NBA. The players do not dispute that the restrictions at issue were covered by the labor exemption when the collective bargaining agreement was still in effect.[4] However, the players, noting that courts have generally refused to find antitrust immunity in the absence of a collective bargaining agreement, argue that the practices are not protected by the nonstatutory exemption because they are not the subject of any currently effective collective bargaining agreement, and because the players have not otherwise consented to them. The NBA vigorously disputes this reading of the exemption, proposing instead that anti-

---

**3.** The scope of the nonstatutory exemption is generally thought to be the same in the traditional labor cases, where it is often used as a defense against claims that employer-employee agreements restrain trade in product markets, and in the sports arena, where teams have used it to block their own employees' claims that player restraints illegally bridle competition in the intraleague labor market. *See Mackey*, 543 F.2d at 614 n. 12.

**4.** Indeed, under the test in *Mackey*, the restraints at issue were shielded from antitrust attack during the terms of the applicable agreements because (1) they related to a mandatory

subject of collective bargaining, with respect to which the NBA and the Players Association were required to bargain in good faith pursuant to section 8(d) of the NLRA, 29 U.S.C. sec. 158(d); (2) they were the product of arm's-length negotiations between the NBA and the Players Association; and (3) they affect only the terms and conditions upon which current and prospective players are employed by NBA teams and do not affect any product market in which the NBA competes. It is also apparent that, should the provisions be embodied in a new collective bargaining agreement, they would again be immune from antitrust challenge.

trust immunity should continue after expiration of the agreement as long as the league continues to apply without modification the player restrictions that were included in the agreement.

As the players observe, courts have generally applied the nonstatutory exemption only where the challenged practices are authorized by a collective bargaining agreement, rejecting broad arguments that labor principles should automatically override antitrust principles as long as an exclusive bargaining representative is in place, or that the antitrust laws do not reach labor market restraints at all. *See, e.g. Smith v. Pro-Football, Inc.*, 420 F.Supp. 738, 742 (D.D.C.1976), *aff'd in part, rev'd in part,* 593 F.2d 1173 (D.C.Cir.1978); *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 886–89 (S.D.N.Y.1975); *McCourt v. California Sports, Inc.*, 600 F.2d 1193, 1197 n. 7 (6th Cir.1979); *Mackey*, 543 F.2d at 616–18.

However, none of the cases cited by the parties address the issue presented in this case, where the challenged provisions were included in a collective bargaining agreement that is no longer in effect. Thus, although I accept the test enunciated in *Mackey* as the correct starting point, resolution of this case requires moving one step beyond *Mackey*. Doing so requires examination of the policies underlying the labor exemption.

The nonstatutory exemption represents an effort to balance the concerns of the federal antitrust and labor laws. The availability of the exemption turns upon whether the federal labor interest in collective bargaining is deserving of pre-eminence over the federal antitrust interest in free competition under the circumstances of the particular case. *See Connell Co., supra; Meatcutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Mackey*, 543 F.2d at 613. By protecting only those practices that were included in a collective bargaining agreement after being subject to arm's-length bargaining, the exemption encourages substantive, good faith bargaining on important issues and guards against unilateral imposition of terms as to which there is no agreement.

Applying these considerations, I find no merit in the players' contention that restrictions included in a collective bargaining agreement should lose their antitrust immunity the moment the agreement expires. At the outset, such a rule is unrealistic in light of the requirement that employers must bargain fully and in good faith before altering a term or condition of employment subject to mandatory bargaining even after the collective bargaining agreement expires. *See, e.g. Industrial Union of Marine and Shipbldg. Workers v. NLRB*, 320 F.2d 615, 620 (3d Cir.1963), *cert. denied sub nom. Bethlehem Steel Co. v. NLRB*, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964); *NLRB v. Katz*, 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962). If an employer unilaterally alters such a term or condition of employment before negotiations reach an "impasse," it may be guilty of committing an unfair labor practice under 29 U.S.C. sec. 158(a)(5). This obligation to maintain the status quo until impasse means that, in a practical sense, terms and conditions of employment that are subjects of mandatory bargaining survive expiration of the collective bargaining agreement.

In fact, the history of collective bargaining in the NBA is punctuated by interim periods between agreements during which the league maintained the status quo and continued to negotiate with the players. This suggests that there is at least a possibility that some of the provisions in the most recent expired agreement will be reenacted in the same form in a future agreement. It would be anomalous for such restraints to enjoy antitrust immunity during the period of the previous agreement, to lose that immunity automatically upon expiration of the agreement—regardless of the status of negotiations for a new agreement—and then to regain immunity upon entry of the new agreement.

Stripping player restraints of their antitrust immunity the instant a collective bar-

gaining agreement expires would also inhibit the collective bargaining process, a result that is contrary to the purpose of the nonstatutory exemption. Because agreements often expire without immediate replacement, employers operating under such a rule would in many cases be reluctant to agree to potentially anticompetitive restraints, even where desired by their employees, for fear that such practices would expose them to antitrust suits during any period between agreements.

The federal labor policy of encouraging collective bargaining also requires rejection of the NBA's position that the exemption should continue indefinitely after an agreement expires so long as the employer maintains the status quo by not imposing any new restraints. This facile manner of evading the antitrust laws would discourage unions from entering collective bargaining agreements, since doing so might forever bar them from challenging those restraints in court. Although, as noted above, the rules embodied in a collective bargaining agreement are not automatically disregarded the instant the clock runs out on the agreement, the game cannot last forever.

Thus, a time will come after expiration of the agreement when the practices that were included in the agreement can no longer be said to exist as an extension of the agreement. At such time, those practices are no longer protected by the labor exemption. The relevant question is when that moment occurs.

■ The players argue that the exemption cannot extend beyond an "impasse" in the negotiations because at that moment, there is no longer mutual consent to the restraints. Impasse is certainly a plausible point at which to end the labor exemption,

for by its very definition it implies a deadlock in negotiations, which could in some cases imply that the employees' consent to the restraints of the prior agreement has ended.[5] The moment of impasse in negotiations is significant, for an employer may, after bargaining with the union to an impasse, make "unilateral changes that are reasonably comprehended within his pre-impasse proposals." *Taft Broadcasting Co.*, 163 N.L.R.B. at 476. After impasse, either party is free to decline to negotiate further. *Cheney California Lumber Co. v. NLRB*, 319 F.2d 375, 380 (9th Cir.1963).

However, an impasse is not equivalent to the end of negotiations, or the loss of hope that any of the practices subject to negotiation will be incorporated in a new agreement. "As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.' " *Charles D. Bonanno Linen Service v. NLRB*, 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982) (quoting *Charles D. Bonanno Linen Service*, 243 N.L.R.B. 1093, 1093–1094 (1979)). An impasse may be brought about intentionally by one or both parties as a device to further, rather than halt, the bargaining process. "Suspension of the process as a result of an impasse may provide time for reflection and a cooling of tempers; it may be used to demonstrate the depth of a party's commitment to a position taken in the bargaining; or it may increase economic pressure on one or both sides, and thus increase the desire for agreement." *Charles Bonanno Linen Service*, 243 N.L.R.B. 1093, 1094 (1979), *enf'd.*, 630 F.2d 25 (1st Cir.1980),

---

**5.** Under the NLRA, impasse exists when the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless. The National Labor Relations Board has summarized the factors to be considered in determining the existence of an impasse as follows:

Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance

of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations, are all relevant factors to be considered in deciding whether an impasse in bargaining existed.

*Taft Broadcasting Co.*, 163 N.L.R.B. 475 (1967), *enf'd sub nom. American Federation of Television and Radio Artists v. NLRB*, 395 F.2d 622 (D.C.Cir.1968).

*aff'd*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed. 2d 656 (1982).

Because an impasse occurs only when the entire negotiating process has come to a standstill, the prospects for incorporating a particular practice into a collective bargaining agreement may also disappear before a full impasse in the negotiations is actually reached. It is at least theoretically possible for the parties, without ever reaching impasse, to enter a collective bargaining agreement that omits one or more of the practices that were included in the previous agreement.

Thus, impasse is a concept developed to deal with the problems of labor law, not with the unique intersection of labor law and antitrust law at issue in this case. I cannot choose the criteria for determining the endpoint of the labor exemption without reference to its purpose—encouraging collective bargaining.

An extension of the *Mackey* formulation produces a rational criterion for declaring when the labor extension expires after termination of the collective bargaining agreement. I find that the exemption for a particular practice survives only as long as the employer continues to impose that restriction unchanged, and reasonably believes that the practice or a close variant of it will be incorporated in the next collective bargaining agreement. When the employer no longer has such a reasonable belief, it is then unilaterally imposing the restriction on its employees, and the restraint can no longer be deemed the product of arm's-length negotiation between the union and the employer.[6]

This formulation is meant to determine the point at which agreement ends on the practices at issue, instead of tying the fate of the exemption to progress in the negotiations as a whole. In any particular case, the exemption may expire before, during or after impasse, and the facts bearing on the impasse question may also bear on the determination of the expiration of the labor exemption. However, they are different questions.

This result is not hampered in this case by the provision in the *Robertson* settlement agreement reserving the players' "right to challenge in a court of competent jurisdiction any future unilateral imposition [of any practice] by the NBA...." This provision, which appears to be a mutual reservation of rights by the Players Association and the NBA, simply applies where the league *unilaterally* imposes restrictions. As long as the NBA has a reasonable belief that a practice may be included in the agreement being negotiated, it is not imposing the practice unilaterally; rather, the restriction is deemed a product of arm's-length negotiations.

Quite obviously, application of this rule in the present case involves issues of material fact that cannot be decided on a motion for summary judgment on the present state of the record. Indeed, resolution of this factual matter may not be possible until after the parties have resolved their differences and entered a new collective bargaining agreement. Therefore, I have denied both the players' and the NBA's motions for summary judgment.

## IV. CONCLUSION

The NBA's motion to require joinder of the Players Association is denied, and the players' and the NBA's motions for summary judgment are denied.

---

**6.** Of course, if the employer changes a practice that was allowed in the expired collective bargaining agreement, then the exemption for that practice is lost until it is actually included in a new agreement, whether or not the employer reasonably believes that it will survive in the next agreement.