NATIONAL BASKETBALL ASSOCIATION, Atlanta Hawks, L.P., Capital Bullets Basketball Club, Inc., Boston Celtics Limited Partnership, Charlotte NBA Limited Partnership, Chicago Professional Sports Limited Partnership, Dallas Basketball Limited, the Denver Nuggets Limited Partnership, Detroit Pis-

tons Basketball Company, Golden State Warriors, Rocket Ball, Ltd., Jazz Basketball Investors, Inc., LAC Basketball Club, Inc., The Los Angeles Lakers, Inc., Madison Square Garden Corporation, Meadowlands Basketball Associates, the Miami Heat Limited Partnership, Milwaukee Bucks, Inc., Minnesota Professional Basketball Limited Partnership, Gund Business Enterprises, Inc., Orlando Magic, Ltd., Pacers Basketball Corporation, The Philadelphia 76ers Basketball Club, Inc., Phoenix Suns Limited Partnership, Sacramento Kings Limited Partnership, L.P., San Antonio Spurs, Ltd., Ackerly Communications, Inc., and Trail Blazers, Inc., Plaintiffs,

v.

Charles L. WILLIAMS, Charles D. Smith, Daniel R. Manning, Rolando A. Blackman, Mark E. Eaton, Lafayette Lever, Herbert L. Williams, James A. Jackson, Dikembe Mutombo, Glenn A. Rivers, David M. Robinson, Reggie Williams, Eric Anderson, Marty Conlon, Christian Laettner, Adrian Autry, Eric Mobley, Trevor Ruffin and Shawnelle Scott, on behalf of themselves and all persons similarly situated, Defendants.

Dominique WILKINS, Horace Grant, Brian Shaw, Dale Davis, Terrell Brandon, Donyell Marshall, Charles L. Williams, Charles D. Smith, Daniel R. Manning, Rolando A. Blackman, Mark E. Eaton, Lafayette Lever, Herbert L. Williams, James A. Jackson, Dikembe Mutombo, Glenn A. Rivers, David M. Robinson, Reggie Williams, Eric Anderson, Marty Conlon, Christian Laettner, Adrian Autry, Shawnelle Scott, on behalf of themselves and all persons similarly situated, and the National Basketball Players Association, Counterclaim-plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, Atlanta Hawks, L.P., Capital Bullets Basketball Club, Inc., Boston Celtics Limited Partnership, Charlotte NBA Limited Partnership, Chicago Professional Sports Limited Partnership, Dal-

las Basketball Limited, The Denver Nuggets Limited Partnership, Detroit Pistons Basketball Company, Golden State Warriors, Rocket Ball, Ltd., Jazz Basketball Investors, Inc., LAC Basketball Club, Inc., The Los Angeles Lakers, Inc., Madison Square Garden Corporation, Meadowlands Basketball Associates, The Miami Heat Limited Partnership, Milwaukee Bucks, Inc., Minnesota Professional Basketball Limited Partnership, Gund Business Enterprises, Inc., Orlando Magic, Ltd., Pacers Basketball Corporation, the Philadelphia 76ers Basketball Club, Inc., Phoenix Suns Limited Partnership, Sacramento Kings Limited Partnership, L.P., San Antonio Spurs, Ltd., Ackerly Communications, Inc., and Trail Blazers, Inc., Counterclaim-defendants.

No. 94 Civ. 4488 (KTD).

United States District Court,
S.D. New York.

July 18, 1994.

Proskauer Rose Goetz & Mendelsohn, Howard L. Ganz, of counsel, Skadden, Arps, Slate, Meagher & Flom, Frank Rothman, Shepard Goldfein, of counsel, Jeffrey A. Mishkin, Sr. Vice–President, Legal and Business Affairs, National Basketball Ass'n, New York City, for plaintiffs and counterclaim-defendants.

Cravath, Swaine & Moore, New York City, Frederick A.O. Schwartz, Jr., Robert S. Rifkind, Rowan D. Wilson, Michelle K. Jacobs, Sara M. Dareshori, of counsel, Bredhoff & Kaiser, Washington, DC, George H. Cohen, Robert M. Weinberg, Andrew D. Roth, for counsel, for defendants and counterclaim-plaintiffs.

Simon P. Gourdine, General Counsel, National Basketball Players Ass'n, New York City, Ronald Klempner, of counsel, for counterclaim-plaintiff National Basketball Players Ass'n.

Lester Bryant Solano & Ganz, P.C., Oklahoma City, OK, James S. Bryant, Robinson

Renaissance, of counsel for counterclaim-plaintiff Donyell Marshall.

Katten Muchin & Zavis, Chicago, IL, Stephen D. Libowsky, Joel G. Chefitz, of counsel, Katten Muchin & Zavis, New York City, John N. Romans, of counsel, for counterclaim-defendant Chicago Professional Sports Ltd. Partnership.

## OPINION

### KEVIN THOMAS DUFFY, District Judge.

The National Basketball Association (the "NBA") and the 27 teams (the "NBA Teams" or "Teams") that compete in the NBA commenced a declaratory action on June 17, 1994 against a class of NBA players as well as prospective NBA players, pursuant to 28 U.S.C. § 2201. In particular, the NBA and the Teams seek a declaration that continued implementation of: (1) the college draft; (2) the right of first refusal; and (3) the salary cap does not violate federal antitrust laws. (Am.Compl. ¶ 105). Alternatively, the NBA contends that these measures are not unreasonable restraints of trade and therefore do not violate the antitrust laws. (Am.Compl. ¶ 113).

The same class of players who are defendants in the declaratory judgment claim, along with the National Basketball Players Association (the "NBPA") (collectively the "Players"), brought counterclaims alleging, in effect, that continuation of these policies are unreasonable restraints of trade not exempt from antitrust law and thereby violate the Sherman Act. (Counterclaims ¶¶ 43, 47, & 51). Shortly after initiating the counterclaims, the Players moved for a temporary restraining order and a preliminary injunction: (1) to enjoin the Teams from entering into player contracts with current or prospective professional basketball players, and (2) schedule an expedited trial on the merits. On June 28, 1994, the Honorable John F. Keenan granted the temporary restraining order and set a hearing date for the preliminary injunction motion. On July 1, 1994, I was assigned this case, and a hearing was conducted on July 8, 1994. At the hearing, I informed the parties that the preliminary injunction hearing would be consolidated with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. A consolidated factual hearing was conducted on July 12, 1994.[1]

## BACKGROUND

This case is the fourth lawsuit initiated by either of the parties as a result of disputes that have arisen during collective bargaining negotiations. Indeed, I am convinced that this is a case where neither party cares about this litigation or the result thereof. Both are simply using the court as a bargaining chip in the collective bargaining process. Each is truly guilty of this practice.[2] A recitation of the history of these lawsuits demonstrates this and puts this litigation in its proper context, i.e., a labor dispute that does not belong in litigation.

In 1970, the Players commenced a class action suit against the NBA in the federal district court for the Southern District of New York, challenging certain NBA imposed player restrictions on antitrust grounds.

1. Counsel for the NBA objected to the shortness of the trial as well as its expedited nature. The Federal Rules of Civil Procedure authorize me to order a speedy hearing for a declaratory judgment action. Fed.R.Civ.P. 57. Thus, they cannot be heard to complain about the expedited nature of a case they initiated. In addition, several other reasons exist for speeding this case along. First, the Teams and the Players use this period to sign contracts and prepare for the upcoming season. It would be unfair to allow this litigation to create a legal cloud over contract negotiations. (See Trial Testimony of David J. Stern, July 12, 1994, at 155–60 (hereinafter "Tr.")). Moreover, the raw facts that underlie this action are not in dispute. The dispute centers on the applicable legal standard. Therefore,

the parties simply needed an opportunity to put the facts on the record. The parties had ample time to do so before, during, and after trial. Finally, I received the parties' papers on July 5, 1994. In such a complicated case that must be resolved quickly, only a judge unwilling to have an open mind would attempt to rule prior to a detailed factual hearing. Therefore, I ordered a trial on the merits for July 11, 1994.

2. The initiation of the declaratory judgment action cannot be said to violate Rule 11 of the Federal Rules of Civil Procedure. It does, however, constitute sharp and shady practices of the type that most ethical lawyers shun.

The NBA moved for summary judgment, arguing that the practices were shielded from antitrust laws by a labor exemption. The district court denied the NBA's motion on the ground that the exemption only shields unions and not employers. *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 884–89 (S.D.N.Y.1975).

In 1976, the parties in *Robertson* entered, and the district court approved, a settlement agreement. This agreement effected a number of changes in the operation of the NBA, including modification of the college draft and institution of the right of first refusal. (Am.Compl. ¶¶ 63–64). The settlement agreement provided that it would expire at the end of the 1986–1987 NBA season. In addition, it expressly provided that the Players had not waived their right to challenge in court any unilateral imposition of any rule, policy, practice or agreement by the NBA. When the *Robertson* settlement agreement was adopted in 1976, the Players and the NBA also entered into a multi-year collective bargaining agreement incorporating the substantive terms of the settlement agreement. The 1976 Collective Bargaining Agreement expired on June 1, 1979, and on October 10, 1980, the parties again entered into a multi-year collective bargaining agreement that expressly incorporated the terms of the *Robertson* settlement agreement, including the college draft and the right of first refusal. (Granik Decl., July 6, 1994, ¶¶ 12–15).

The 1980 agreement expired on June 1, 1982. (1980 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 2, Art. XXVI). In 1983, the NBA sought for the first time to introduce the salary cap. The NBA contended that such a restriction was necessary because the majority of NBA teams were losing money, due in part, to rising player salaries and benefits. (*See* Grantham Trial Decl., July 11, 1994, ¶¶ 3, 13). The players responded by filing a lawsuit challenging the legality of the salary cap. *Lanier v. National Basketball Ass'n*, 82 Civ. 4935 (S.D.N.Y.). A special master appointed to hear disputes under the *Robertson* settlement agreement determined that the salary cap would violate the terms of the settlement agreement and, therefore, could not be im-

posed without a modification of that agreement. (Granik Decl., July 6, 1994, ¶¶ 17–19). The Players and the NBA entered into a Memorandum of Understanding that modified the expired 1980 Collective Bargaining Agreement to include a salary cap, and it continued in force through the end of the 1986–1987 season. (Granik Decl., July 6, 1994, Ex. 3).

On June 8, 1987, the NBA and the Players entered into a Moratorium Agreement to facilitate negotiations, whereby the challenged practices would remain in effect but no new contracts would be signed. The Moratorium Agreement expired on October 1, 1987. (Grantham Decl. 31 & Ex. A). The day the Moratorium Agreement expired, the Players commenced an action in the District of New Jersey, seeking a ruling that the college draft, the right of first refusal, and the salary cap violated the antitrust laws. *Bridgeman v. National Basketball Ass'n*, 675 F.Supp. 960, 961 (D.N.J.1987). The Players represented to the court that they would never agree to these restrictive practices. (Granik Decl., July 6, 1994, Ex. 4). After a ruling on the labor exemption issue, discussed more fully below, the parties reached an agreement in principle, the final terms of which were memorialized in the 1988 Collective Bargaining Agreement. (Granik Decl., July 6, 1994, ¶¶ 29). The 1988 Collective Bargaining Agreement continued the college draft, the right of first refusal and the salary cap. (1988 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 5, Arts. IV, V, & VII).

The 1988 Collective Bargaining Agreement formally expired on June 23, 1994, the day following the last playoff game of the 1993–1994 NBA playing season. (Grantham Decl., June 26, 1994, ¶ 4). At a formal bargaining session, held in New York on April 7, 1994, the Players demanded that the three disputed employment practices be eliminated. (Grantham Decl., June 26, 1994, ¶¶ 39–40). In a position paper delivered to the NBA at that meeting, the Players expressly stated their view that the college draft, right of first refusal and the salary cap would "be subject to successful challenge under the antitrust laws." This position was reiterated at a sec-

ond formal bargaining session, held on May 4, 1994. (Granik Decl., July 6, 1994, ¶ 33).

On June 15, 1994, in a letter addressed to the NBA, the Players, while asserting that further negotiations would be futile, said that the Players would attend another meeting, but only in late June or mid-July. In that letter, the NBPA again threatened that the NBA's continuation of the employment conditions at issue would be "subject to scrutiny under the antitrust laws and . . . are clearly in violation of those laws." (Granik Decl., July 6, 1994, ¶ 33). At the preliminary injunction hearing on July 8, 1994, I informed the parties of my belief that this litigation was simply being used as a bargaining chip in the collective bargaining negotiations, and I advised them that the best course of action would be to resolve the dispute through negotiations. (Transcript of Preliminary Injunction Hearing, July 8, 1994, at 8–9). Apparently, the parties did attempt to negotiate, but such efforts were unsuccessful. (Stern Testimony, Tr. at 153).

### The Challenged Measures
### The College Draft

The college draft is held annually shortly after the NBA season concludes. It is a mechanism in which each team is allotted two selections. A team may exercise its selections or trade them to another team. The order of selection is generally determined by the records of the 27 Teams for the season immediately preceding the draft, *i.e.*, the weaker teams select earlier. In the end, 54 prospective players are selected by the Teams. A player who is selected by a particular team may only negotiate with that team. Any team that negotiates with a player it did not select is severely penalized. Prospective players who are not drafted are free to negotiate with any NBA team. (1988 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 5, Art. IV).

### The Right of First Refusal

Under the 1988 Collective Bargaining Agreement, the Teams maintain a right of first refusal over players who have played fewer than four seasons or who have not completed at least two contracts. When a player's contract expires, he is able to negotiate a new contract with any team. If a team has a right of first refusal over that player, however, it may match any offer another team makes. If there is a matching offer, the player may not sign with the new team, and his services are retained by his current team. (1988 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 5, Art. V).

### The Salary Cap

The salary cap is part of a complex player/owner revenue sharing arrangement in which the Players are guaranteed a percentage of the defined gross revenue of the team. This arrangement also operates as a ceiling on the total amount a team may spend on salaries for its players. As part of this arrangement, each team is also required to pay a minimum amount of salaries to its players (1988 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 5, Art. VII, Pt. A, Sec. 1(e)–(f)). The salary cap may be exceeded by a team that wishes to pay a veteran player it currently employs. A team may, however, not exceed the salary cap to acquire a new player. (1988 Collective Bargaining Agreement, Granik Decl., July 6, 1994, Ex. 5, Art. VII, Pt. F).

### DISCUSSION

### (1) The Nonstatutory Labor Exemption

■ As a threshold matter, the NBA argues that antitrust law does not apply in this case because a collective bargaining relationship currently exists between the players and the NBA.[3] In particular, the NBA contends

---

3. In addition to the objection outlined in the text, the NBA objected to the July 11, 1994 trial, contending that jurisdiction did not exist because of the Norris–LaGuardia Act's prohibition against injunctions involving labor disputes. *See* 29 U.S.C. § 101 et seq. Putting aside the merits of this dubious proposition, *but see Jackson v. National Football League*, 802 F.Supp. 226, 233

(D.Minn.1992); *Cordova v. Bache & Co.*, 321 F.Supp. 600, 606 (S.D.N.Y.1970), the trial was necessary to elicit the facts of the claims set forth in the NBA's declaratory judgment action. It astounds me to no end that the NBA initiated this action, and then attempted to hinder the court from taking the necessary steps to decide this matter quickly. *See* Fed.R.Civ.P. 57. But, it

that the nonstatutory labor exemption applies, and therefore, any antitrust claim the Players may seek must fail.

■ The parties do not dispute that prior to the formal expiration of the Collective Bargaining Agreement on June 23, 1994, the NBA as well as the Players were immune from antitrust claims. *Wood v. National Basketball Ass'n,* 809 F.2d 954, 963 (2d Cir. 1987). In *Wood,* the Second Circuit specifically held that an antitrust challenge to the NBA's salary cap and college draft, *inter alia,* failed because antitrust laws may not "be used to subvert fundamental principles of our federal labor policy...." *Id.* at 959. Thus, the law in this Circuit appears to be where a collective bargaining relationship exists, federal labor law applies to the disputes that arise between the bargaining parties. *Id.*

In a 1976 case involving player restraints in the National Football League (the "NFL"), the Court of Appeals for the Eighth Circuit analyzed the nonstatutory exemption as it applies to the market for player services and established a three pronged test for application of the exemption. *Mackey v. National Football League,* 543 F.2d 606, 615 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). First, the restraint on trade must primarily affect only the parties to the collective bargaining relationship. Second, the agreement must concern mandatory subjects of collective bargaining. Finally, the agreement sought to be exempted is the product of bona fide arms-length bargaining. *Id. Mackey* reasoned that these tests are necessary to ensure that the exemption is applied only when it is clear that federal labor policies trump antitrust concerns. *Id.* Thus, *Mackey* also depends on a resolution of the conflicting labor and antitrust policy concerns.

The dispute here arises because the 1988 Collective Bargaining Agreement has formally expired. The issue is whether antitrust immunity that existed while the Collective Bargaining Agreement was in effect continues after its formal expiration, and if so, for what length of time. I can find only four

non-binding decisions addressing this precise issue. Unfortunately, each decision fashioned a different standard to apply.

The first case to address this issue was *Bridgeman v. National Basketball Ass'n,* 675 F.Supp. 960 (D.N.J.1987). As noted in the factual summary *supra,* in *Bridgeman,* the Players alleged that the continued effect of the college draft, the right of first refusal and the salary cap after the formal expiration of the 1983 Collective Bargaining Agreement violated federal antitrust laws. *Id.* at 961. The NBA moved for summary judgment contending that the nonstatutory exemption immunized them from suit even though the 1983 Collective Bargaining Agreement had formally expired. Thus, the issue before the *Bridgeman* court was identical to the issue here.

The court refused to accept the Players' contention that antitrust immunity ends at the moment the collective bargaining agreement formally expires. *Id.* at 965. The court noted that such a result would not be consistent with the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "NLRA"). *Id.* Under the NLRA, the owners have an obligation, even after the collective bargaining agreement expires, to bargain fully and in good faith before altering a term or condition of employment that is a mandatory subject of collective bargaining. One can easily imagine the howls to be heard from the Players if the Teams unilaterally terminated medical coverage for them and their families at the formal expiration of the Collective Bargaining Agreement. It is for the good of our entire society that such is not the law. *See* 29 U.S.C. § 158(a)(5). The *Bridgeman* court determined that the practical effect of this duty on employers is that the "terms and conditions of employment that are the subject of mandatory bargaining survive expiration of collective bargaining agreement." *Bridgeman,* 675 F.Supp. at 965.

The *Bridgeman* court also found the NBA's contention that antitrust immunity lasts indefinitely equally unavailing. *Id.* at 966. In particular, the court reasoned that such a rule would discourage unions from entering into agreements, for fear of forever

---

may be merely the continuation of the practices     referred to in footnote 2.

binding themselves with restraints that they could not subsequently attack in the court-room. *Id.* After considering the elements of the *Mackey* test, the issue turned on whether the disputed terms will likely become part of a subsequent collective bargaining agreement. Thus, the test that *Bridgeman* established was that antitrust immunity survives only as long as the employer continues to impose the restrictions unchanged, and reasonably believes that the challenged practice or a close variant of it will be incorporated in the next collective bargaining agreement. *Id.* at 967.

In *Powell v. National Football League*, 678 F.Supp. 777 (D.Minn.1988), Judge Doty of the District Court of Minnesota addressed whether the NFL could continue to restrict player movement after the formal expiration of a collective bargaining agreement. Judge Doty agreed with *Bridgeman* to the extent that immunity does not cease with the formal expiration of the collective bargaining agreement. Nor does it continue indefinitely. *Id.* at 786–88. Judge Doty, however, held that the *Bridgeman* standard did not give proper regard for federal labor policy because it could encourage unions to be uncompromising while bargaining. *Id.* at 787. Rather, Judge Doty adopted the so-called impasse standard to be the appropriate standard. *Id.* at 788. Impasse was then defined as the point at which "there appears no realistic possibility that continuing discussions concerning the provision at issue would be fruitful." *Powell,* 678 F.Supp. at 788. Thus, by "allowing a labor exemption to survive only until impasse, the law will not insulate a practice from antitrust liability, but will only delay enforcement of the substantive law until continued negotiations over the challenged provision become pointless." *Id.* at 789.

*Powell* was reversed by the Court of Appeals for the Eighth Circuit in *Powell v. National Football League*, 930 F.2d 1293, 1304 (8th Cir.1989), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991)

(" *Powell II* "). Specifically, *Powell II* held that the nonstatutory labor exemption extends beyond a mere impasse in negotiations and for as long as the labor relationship continues. *Id.* at 1303–04. The Eighth Circuit reasoned that once a collective bargaining relationship is established, federal labor policies become pre-eminent. As such, labor laws provide the opposing parties with sufficient tools to settle a dispute. For instance, employees may strike, employers may lock players out, and both parties may petition the National Labor Relations Board to prohibit unfair labor practices. Therefore, to provide the union with the ability to sue for treble damages under antitrust law "would . . . improperly upset the careful balance established by Congress through the labor law." *Id.* at 1302.

The essence of *Powell II* is that once a collective bargaining arrangement is established, and a valid and bona fide collective bargaining agreement is formed, federal labor law and its policies control. In other words, the disputes that arise from collective bargaining arrangements are labor disputes, and Congress has enacted laws that provide various remedies to these disputes. *Id.* at 1302–03. As the Eighth Circuit stated:

> The labor arena is one with well established rules which are intended to foster negotiated settlements rather than intervention by the courts. The League and the Players have accepted this "level playing field" as the basis for their often tempestuous relationship, and we believe that there is substantial justification for requiring the parties to continue to fight on it, so that bargaining and the exertion of economic force may be used to bring about legitimate compromise. *Id.* at 1303.

In sum, *Powell II* effectively held that antitrust immunity exists as long as a collective bargaining relationship exists and labor law remedies are available. *Id.* at 1303–04.[4]

4. Senior Judge Heaney dissented in *Powell II* and Chief Judge Lay, along with Judge McMillian, dissented from a denial of a rehearing en banc. These dissents argue that *Powell II* will discourage collective bargaining, fails to consider that in order for the exemption to apply union consent is necessary, and encourages union de-certification. *Powell II,* 930 F.2d at 1304–10 (dissenting opinions). Both dissents favor application of the impasse standard enunciated by the district court. *Id.*

In *Brown v. Pro Football, Inc.*, 782 F.Supp. 125 (D.D.C.1991), the District Court for the District of Columbia set forth yet another approach to this issue. There, the court held that the continuing implementation of a collective bargaining agreement's salary provisions by the NFL after the agreement had expired was not shielded by the nonstatutory labor exemption. Instead, the exemption ended with expiration of the agreement. *Id.* at 130. The court reasoned that the purpose of the exemption was to foster a non-coercive environment conducive to the serious negotiation of a new agreement. If an employer was satisfied with the terms of the previous agreement, the extension of the exemption beyond contracted expiration date would discourage serious negotiation on its part. *Id.* at 131. In addition, the court reasoned that the extension of the exemption would deprive labor of an important bargaining chip—the threat of treble damages under the antitrust laws. *Id.* at 133. As such, immunity from antitrust law does not extend past the formal expiration of the collective bargaining agreement. *Id.* at 131.[5]

This review of the case law establishes that, if nothing else, opinions vary a great deal on this issue. *See, e.g.*, Kieran M. Corcoran, *When Does the Buzzer Sound?: The Nonstatutory Labor Exemption in Professional Sports*, 94 Colum.L.Rev. 1045, 1071 (1994) (favoring a standard based on union consent); Ethan Lock, *The Scope of the Labor Exemption in Professional Sports*, 1989 Duke L.J. 339, 400 (favoring ending the exemption at the formal expiration of the collective bargaining agreement). Obviously, this issue stems from the underlying conflict between antitrust and labor law policies. The issue, at its most basic level, is what role, if any, does antitrust policy play when a valid collective bargaining relationship exists. To find an answer to this question, I believe it is necessary to review the origin of the nonstatutory exemption.

The nonstatutory exemption was created by the Supreme Court to reconcile the conflicting policies between antitrust and labor laws.

> [W]e have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.

*Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945). *See also Connell Constr. Co. v. Plumber & Steamfitters Local Union No. 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835–36, 44 L.Ed.2d 418 (1975).

The genesis of the labor exemption is *Allen Bradley*. In *Allen Bradley*, a group of New York City electrical equipment manufacturers and contractors—in furtherance of a broad industry-wide conspiracy to prevent electrical equipment manufacturers located outside of New York from selling their products within the City—entered into various collective bargaining agreements with a New York City union. In the agreements, the contractors agreed to purchase equipment only from local manufacturers, who had entered into closed-shop agreements with the union. In return, the manufacturers agreed to confine their New York City sales to contractors employing the union's members. Several equipment manufacturers located outside New York City brought an antitrust suit against the union. *Id.* at 799–800. The Court concluded that the union's participation in the employers' conspiracy in restraint of trade was not sufficient to immunize the parties' agreement from antitrust liability. *Id.* at 808.

The Supreme Court rendered a similar conclusion in *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Pennington*, a group of large coal companies—in furtherance of a conspiracy with the United Mine Workers to drive smaller companies out of

---

**5.** *Brown* alternatively held that the exemption does not extend past the point of impasse.

*Brown*, 782 F.Supp. at 137.

the coal industry—entered into a multi-employer collective bargaining agreement with the union that provided for increased wages and royalty payments into union pension and welfare fund. In return for those benefits, the union agreed that it would seek to impose the benefit provision of the multi-employer agreement on all industry employers without regard to their ability to pay. *Id.* at 660, 85 S.Ct. at 1588. Two smaller companies that had been pressured into paying the higher benefits brought an antitrust suit. The Court noted that a union may conclude a wage agreement that is shielded from antitrust laws, but it forfeits such immunity when it conspires with the employers "to eliminate competitors from the industry." *Id.* at 665–66, 85 S.Ct. at 1591.

In *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), a group of food store owners entered into a multi-employer collective bargaining agreement with a union to limit the hours and days of operation of the stores' meat departments. When a competing food store refused the union's demand that it agree to this same limitation, the union struck the employer to obtain that limitation. The competing food store sued the union and the employers who were party to the multi-employer agreement for antitrust violations. *Id.* at 679–81, 85 S.Ct. at 1597–98. A three member plurality ruled that the union was shielded from antitrust liability because it obtained these provisions "through bona fide, arm's length bargaining in pursuit of [its] own labor union policies, and not at the behest of or in combination with nonlabor groups." *Id.* at 689–90, 85 S.Ct. at 1602.[6]

In the case at bar, the Players cite these cases for the proposition that union consent, while not always sufficient, is necessary for the labor exemption to apply. Indeed, *Mackey* 's third element, that the agreement be the product of bona fide arm's-length bargaining, is derived from the view that

*Allen Bradley, Pennington,* and *Jewel Tea* stand for this proposition. *Mackey,* 543 F.2d at 611–14. *See also Powell,* 678 F.Supp. at 784–85; *Bridgeman,* 675 F.Supp. at 964–65 (adopting similar approach). Thus, the Players argue that absent union consent to the challenged measures through a valid collective bargaining agreement, the exemption no longer applies. Moreover, they contend that union consent ended on June 23, 1994, with the formal expiration of the 1988 Collective Bargaining Agreement.

The Players' reading of these Supreme Court cases is, however, fundamentally flawed. These decisions involve "injuries to *employers* who asserted that they were being excluded from competition in the product market." *Wood,* 809 F.2d at 963 (emphasis in original). The fact is that no Supreme Court decision has addressed whether a dispute between collective bargaining parties, duly authorized under the labor laws to represent either the employers or employees at the bargaining table, are immune from antitrust liability.

> From *Allen Bradley* to *Pennington,* the majority of the Court has insisted that one factor be present before the Sherman Act applies to arrangements arrived at through collective bargaining: one group of employers must conspire to use the union to hurt their competitors. The line the Court has consistently sought to draw, therefore, is the line between the product market and the labor market.

Michael S. Jacobs & Ralph K. Winter, Jr., *Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage,* 81 Yale L.J. 1, 26 (1971). Thus, to apply the exemption as enunciated in *Allen Bradley, Pennington,* and *Jewel Tea* to disputes between employees and employers in a collective bargaining relationship does not fully account for the policies underlying federal labor law. Moreover, such a ruling would exaggerate federal antitrust concerns. *See Wood,* 809 F.2d at 959–63.

---

6. On behalf of a concurring panel of three, Justice Goldberg urged a holding that "a union acting as a union, in the interests of its members, and not acting to fix prices or allocate markets in aid of an employer conspiracy to accomplish these objects ... is not subject to challenge under the antitrust laws." *Jewel Tea,* 381 U.S. at 710, 85 S.Ct. at 1614. (Goldberg, J., concurring).

Collective bargaining seeks to order labor markets through a system of countervailing power. Thus it is often referred to by economists as bilateral monopoly. If such a structure is to be protected by law, then logically the antitrust claims between employers and employees must be extinguished.

Jacobs & Winter, *Antitrust Principles,* 81 Yale L.J. at 22. Indeed, *Wood* noted this distinction between the product and labor markets and, by implication, concluded that where a dispute implicates the labor market, antitrust actions should not be allowed to subvert federal labor law policies. *Wood,* 809 F.2d at 963. In this case, labor market disputes are the central concern. As such, this dispute is one to be resolved by federal labor law.

■ This reasoning mandates that the appropriate standard to apply is the *Powell II* standard. Antitrust immunity exists as long as a collective bargaining relationship exists. *Powell II,* 930 F.2d at 1303–04. Accordingly, the NBA is granted the declaration it seeks—the continued implementation of these challenged measures by the NBA do not violate the antitrust laws as long as the collective bargaining relationship exists.

This does not mean that the Players are "stuck" with these provisions forever. Certainly, they can attempt to bargain these provisions away—including exerting economic pressure by means of a strike. Or, the Players may request decertification of the NBPA as a collective bargaining agent. I do not mean by this ruling to encourage the Players to decertify their union so that they may bring an antitrust claim. But, decertification is certainly an option the Players have. In fact, this is exactly what the National Football League Players Union did following *Powell II. See Powell v. National Football League,* 764 F.Supp. 1351, 1356 (D.Minn. 1991). Decertification, however, brings with it other consequences, namely the elimination of many federal labor remedies. In other words, the NBPA is a private actor with a variety of available choices. It is up to the Players to weigh the risks of all their actions. While I am not unconcerned that this decision may affect their decision to decertify, I simply note that the Players may not have it both ways. They may not avail themselves to the benefits of federal labor and antitrust law at the same time.

### (2) *Antitrust Analysis*

■ It appears that even if the nonstatutory exemption did not apply, the Players' charge of a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, is insufficient to carry the day. It has often been recognized that any contract between an employer and employee is a restraint of trade. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918). Therefore,

Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anti-competitive that each is illegal *per se* without inquiry into the harm it has actually caused. Other combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect.

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740 (1984) (citations omitted). *See also Continental T.V. Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49–51, 97 S.Ct. 2549, 2557–58, 53 L.Ed.2d 568 (1977). Professional athletic associations are more generally, and appropriately, characterized as joint ventures. *North American Soccer League v. National Football League,* 670 F.2d 1249, 1251 (2d Cir. 1982). As the Court of Appeals for the District of Columbia put it, describing the National Football League:

[T]he NFL clubs which have "combined" to implement the draft are not *competitors* in any economic sense. The clubs operate basically as a joint venture in producing an entertainment product—football games and telecasts. No NFL club can produce this product without agreements and joint action with every other team. To this end, the League not only determines franchise

locations, playing schedules, and broadcast terms, but also ensures that the clubs receive equal shares of telecast and ticket revenues. These economic joint venturers "compete" on the playing field, to be sure, but here as well cooperation is essential if the entertainment product is to attain a high quality: only if the teams are "competitively balanced" will spectator interest be maintained at a high pitch. No NFL team, in short, is interested in driving another team out of business, whether in the counting-house or on the football field, for if the League fails, no one team can survive.

*Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178–79 (D.C.Cir.1978) (emphasis in original). *See also Mackey,* 543 F.2d at 619 ("Although businessmen cannot wholly evade the antitrust laws by characterizing their operation as a joint venture, we conclude that the unique nature of the business of professional football renders it inappropriate to mechanically apply per se illegality rules here, fashioned in a different context."). As the College Draft, Right of First Refusal, and Salary Cap do not meet stringent per se conditions, (*North American Soccer League,* 670 F.2d at 1258), the legitimacy of these restraints depends upon their reasonableness.

The rule of reason, as set forth in *National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), considers whether the challenged contracts or acts "were unreasonably restrictive of competitive conditions." *Id.* at 690, 98 S.Ct. at 1365 (quoting *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911)).

> Unreasonableness under that test could be based either (1) on the nature or character of the [conduct] or (2) on surrounding circumstances giving rise to the inference or presumption that [it was] intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.

*Id.* (citations omitted)

Even under a rule of reason analysis, however, it appears that the Players have failed to show that the alleged restraints of trade are on balance unreasonably anti-competitive. The pro-competitive effects of these practices, in particular the maintenance of competitive balance, may outweigh their restrictive consequences. Indeed, the Salary Cap seems to operate as a mechanism to distribute 53 per cent defined gross revenue to the Players. (Tr. at 108–09). *See Mackey,* 543 F.2d at 623 ("It may be that some reasonable restrictions relating to player transfers are necessary for the successful operation of the NFL. The protection of mutual interests of both the players and the clubs may indeed require this.").

## CONCLUSION

For the foregoing reasons, the NBA and Teams' continued implementation of the college draft, right of first refusal, and the salary cap is hereby declared not to violate antitrust laws. This ruling mandates that the Players' counterclaims be denied. Parties are once again urged to pursue the only rational course for the resolution of their disputes; that is, a course of collective bargaining pursued by both sides in good faith. No court, no matter how highly situated, can replace this time honored manner of labor dispute resolution. Rather than clogging the courts with unnecessary litigation, the parties should pursue this course.